Good morning, may it please the court. My name is David Schlesinger. I represent the petitioners Dr. Albert Papazyan and Mrs. Bartusch Papazyan. The Papazyans are actually present in court today. They're seated in the back row on the right side of the courtroom. With the court's indulgence, I'd actually like to start with the Papazyan's torture conviction claim, and then, time permitting, transition to some aspects of the adverse credibility determination before reserving approximately a minute and a half to two minutes for a rebuttal. Now, let me start at the outset, Your Honor. What are you going to start with? I'd like to start with the torture conviction claim, Your Honor, but if the court would permit. Why don't you start with the others? Certainly, Your Honor. Yeah. Well, it's our view, Your Honor, that in this pre-Real Idea Act case that the First, you've got to get over the adverse credibility finding, right? Well, it's our position, Your Honor, that even though there was an adverse credibility determination, even if that were accepted as true, it cannot, under Comalthus v. INS, wash over the objective evidence of record supporting the Papazyan's torture conviction claim. And we submit that the most important error that You're not going to challenge the adverse credibility? No, we are. We are challenging it, Your Honor. Well, let's do it. Okay. I'll be glad to start with it. There were six findings that the BIA adopted from the IJ that, in the BIA's estimation, support the adverse credibility determination. We believe in this pre-Real Idea Act case that not a single one of those six determinations sufficed to go to the heart of the claim as was required under the pre-Real Idea Act law. That is, not a single one of those six was material. Let me go one by one through those, since Your Honor has expressed interest in my discussing them. The first regards Dr. Papazyan's not disclosing his sons, Iannouk and Verouchin, in his original I-589 application and then subsequently in his original direct examination before the hearing continued. It's our view that Dr. Papazyan offered a plausible explanation for not disclosing Iannouk and Verouchin. Iannouk had been murdered by the Oman paramilitary force in 2000. It was a very painful incident for the Papazyans. As a result, he believed it was a private matter that should only be discussed with him. Was he counseled at the time he interviewed with the asylum officer? He was counseled at the time he interviewed with the asylum officer, Your Honor. He was not counseled at the time he filed his original I-589 application. And he did not mention either son at the time of the interview with the asylum officer? He didn't mention it, although I should point out, Your Honor, that he was not specifically asked by the asylum officer. But if he's counseled, and the counsel is trying to figure out what kind of an asylum claim we've got, any competent counsel would know that it's relevant that a son has been killed on account of a protected ground. It's my understanding, Your Honor, that he did not even disclose the existence of his sons to either his first counsel, who was present at the asylum interview, nor his, I believe, second counsel, Tatiana Edwards, who was counseling him at the time of the asylum hearing. Any competent counsel would have asked questions. So it would have – of course, not at liberty. I mean, I don't know what was asked. But any competent counsel preparing for an officer, an interview with an asylum officer, would have said, has anything bad happened to any member of your family? I suppose, Your Honor, there's no record here of the specific attorney-client communications regarding the children. So it's our view that, yes, he should have disclosed it. And no one's condoning his failure to do so. However, it did come out later, he did give a plausible explanation for Yanuk, the extreme grief that the murder caused the family, for Hrushin, the estrangement between parent and child. Well, you can understand the estrangement argument may be coming from another culture, but that's one thing. But your son being murdered by the police, I mean, the doctor was supposed to be an intelligent man. Even he's going to know that that's something that's going to aid his cause. And probably that was what they told Ferguson, his second lawyer, when she indicated some sort of concern or surprise at a hearing about something that was told. We don't know what it was, but maybe that was it. We don't know, I guess. We don't know, Your Honor, and I think it's fair to note, though, that What did the application say? He did not disclose the sons in the application, Your Honor. What was the question? On the application, there was a section in which you were required to list any children that you have, and he did not disclose them. Well, children that you have, but he has a son who was killed. And how long ago was that? It was in 2000, Your Honor, October of 2000. 2000. And then he had another son that they had a falling out, they were estranged, and he hadn't had any contact with that son for how many years? He had not had contact with Verushin since January of 2002. How many years? At that point, at the time of the beginning of the asylum hearing, it had been more than three years. Essentially, though, they had become estranged as early as 1995, when long-term serious girlfriend whom the parents did not approve of, and they Would the parents tell him? Parents told him that she was not accepted in the household. That was in January 2002, and they had expressed that sentiment to him even earlier than that. So it's our view that Yanuk was withheld for plausible reasons, and the same with Verushin, and Yanuk's being withheld, actually, didn't help the Papazian's asylum application. If anything, it hurt them. It was a highly material fact that he had been murdered by the Oman paramilitary force in October of 2000. So he wasn't in any way trying to embellish his application. If anything, he foolishly hurt himself. Well, but the standard problem that we run into is that stories get better. So the first story told either on the application or in the interview with the asylum officer is not, by itself, enough to entitle someone to asylum, or at least they worry. And then the story gets better by the time you get to the live testimony in front of the IJ. That's a ground for disbelieving the later story. I should note, Your Honor, that there is corroboratory evidence supporting Yanuk's being murdered, such as his death certificate and his hospitalization records from the 1999 incident in which Skinhead savagely beat him. Well, what's the evidence, what's the corroborating evidence tell us? It tells us that he's dead. Does it tell us the manner in which he was killed or what led to his death? I don't know whether the death certificate, and I'll check on this during the government's argument, Your Honor. I don't know whether it actually discloses the manner of death, but the hospitalization records from 1999 disclose that he was in the hospital for two weeks. So, again, no one can know. But the manner of death is the issue, not death. That's correct, Your Honor. We also note that Mrs. Papazian's testimony, and before I reserve some time for rebuttal, let me briefly get to this point. Mrs. Papazian's uncontroverted testimony, for which there was no credibility determination made, therefore, under pre-real IDAC law, she has to be presumed credible, bolstered this. And, indeed, it bolstered her entire testimony. And so perhaps when I have my rebuttal time, I can go into why I think Mrs. Papazian's testimony would, even if this Court were to affirm the adverse credibility determination, would by itself be enough to support reversal of the torture convention claim. Let me ask you another. If we take you over, it's our problem, not yours. Okay. Thank you very much, Your Honor. Another problem I've got with the story, or something that seems to me to support the adverse credibility finding, is that the story told is that the bad guys come into the apartment, oblige them to sign over ownership of the apartment. Then it turns out they can stay a little later in the apartment. But more important, it turns out later on that they still own the apartment and they can sell it. So it doesn't fit very well that they were forced to sign over the apartment and then they leave. And then it turns out they didn't lose the apartment after all. Can you help me understand? You certainly are. I would submit that the objective country condition evidence shows that Russia is by no means a country operating under the rule of law. Well, I got that part, yeah. And so even in United States jurisdictions, there could be, as we've seen in the past, there could be problems with paperwork regarding mortgages or other title documents that could essentially nullify an attempted transfer of ownership. I think it's quite plausible, Your Honor, that the thugs who coerced the Papazians into attempting to sign over ownership of their apartment might very well not have completed the proper paperwork. And therefore, a valid title transfer may not have occurred. Did he say that he didn't sign a power of attorney or something like that, that was necessary for transfer of title? His view, Your Honor. And so these Kazakhs didn't have the documentation to take the apartment. Wasn't that in there? There's something like that, Your Honor. His view is that because Propiska listed multiple people as residents of the transfer to be valid. So there was something that went awry with finalizing that transaction, huh? I think that very well may be the case, Your Honor. Then when he checked later on, he found out it was still in his name. That's right. As late as the end of 2003, perhaps into mid-2004, at which point the Papazians executed a power of attorney, made sure all the signatures were executed, and then validly conveyed the apartment for, I think, approximately $40,000. Another question I've got. Certainly, Your Honor. And that is as to timing. The testimony was very precise in terms of when the thugs come into the apartment and force them to sign it over, whether imperfectly or not. And then the testimony is that at that point they go to the travel agency to try to get the documents to leave. Yet we have a letter from the travel agency that's dated a month or two before that. That seems to me inconsistent with the story. Can you help me understand how that's? On the face I would acknowledge it's consistent, Your Honor, but Dr. Papazian testified that he never saw that document before the travel agency issued. So it's certainly. Well, did he go to the travel agency? He did go to the travel agency on January 11th of 2003, Your Honor, and his tourist visa application actually evidenced that. But didn't he testify that the only documents he gave to the travel agency were birth certificates, passports, marriage certificates, diplomas, and Yennex debt certificate? That's correct, Your Honor. All right. And then he got back documentation or Russian-Hawaiian tours. They were handling all the paperwork, weren't they? They were handling all the initial paperwork that was submitted to the U.S. Embassy in Moscow. That's correct, Your Honor. So who put the date on the travel papers, on that letter that they got? Certainly, Your Honor. All the available evidence indicates, Your Honor, that it was the travel agency that did the dating and created these documents. Dr. Papazian had nothing to do with them. So they put a date on it, and he gave a date on when he signed over, right? He signed the visa, the tourist application, the nonimmigrant visa application, on January 11th of 2003, Your Honor. But he wasn't, was he the one that gave the date to get the visa? Where'd that date come from? Are you asking about January 11th, 2003? I could actually give you the specific year and page number. There's a discrepancy in those dates. We acknowledge that there was a page difference. He said after the Cossacks came in there, that's when he decided definitely he was going to leave, right? That's correct, Your Honor. But he did apply for a tourist visa to visit America. That's correct, Your Honor. And did he handle a paperwork on that? He submitted the paperwork to the... What did he submit? The documents that you just described, his diplomas, his report certificates, et cetera. The travel agency admittedly... He gave those documents to... He gave them to some representative of the tourist agency, the Russia Hawaii Tourism Incorporated. And that was on January 11th of 2003. Well, the date, the date, the visa application was dated on the 11th. What was the date on those papers that he got from the tour? Mr. Chair, we acknowledge that the letter that the travel agency wrote to the U.S. Embassy was dated, I believe, December 5th of 2002. And there was an earlier document, I believe, which we believe to be fraudulent from the supposedly Cimex Corporation. Have you gone through all of this? You see, when you got up there, to me the critical thing here is credibility. But you were going to go off on some other tangent. And now you see why it's important? Well, I think it's important, of course, for the asylum claim. Well, we're telling you what's important. Certainly, Your Honor, I understand. I don't care what you thought was important when you got up there. I understand, Your Honor. Now you know what was important. Certainly. Did you go through each one of these things? Absolutely, Your Honor. You did? But I thought it was... The reason why I wanted to start with the Torture Convention claim, Your Honor, was because I just wanted to make sure that the panel understood that we believe this is a strongly meritorious argument, and that even if the adverse credibility determination were to stand, we'd still believe that the Torture Convention claim should be reversed. But if the story is unbelievable, I can't see how the torture, the cat claim, goes. If we don't believe the story that we're told, how can we, how can that support, what do we have then to support the cat claim? We have Mrs. Papazian's uncontroverted testimony, and we also have objective evidence, not only their corroboratory evidence, but also the country condition evidence, the extensive country condition evidence we submitted showing that there is a pervasive pattern and practice of persecution of ethnic Armenians throughout the Russian Federation. And so our view is that because Mrs. Papazian's testimony was never assessed by BIJ or the BIA, and it is credible and it does support that the Papazians, both Yanuk, Mrs. Papazian, and Dr. Papazian, and some of the members of the family jointly, were confronted and beaten as many as ten times by members of the Russian government or quasi-members of the Russian government. Therefore, it is more likely than not that they would be tortured if they were returned to the Russian Federation. So that's our view regarding the Torture Convention. And, Your Honor, and I offer my apologies to the Court for wanting to start with it when the Court really wanted to focus on average credibility, but this is because I think it's a very important point that needed to be emphasized. Another problem that seems to me shows up in the testimony, the government lawyer on cross was very careful in asking about children and said, have you ever had more than one child? And the answer was clear. The answer was no. And then the government pulls out of its pocket, or she pulls out of her pocket, the document with respect to the apartment, and all of a sudden it turns out there's another person. I understand that there may be estrangement, and I even understand the metaphor, he's dead to us. But when you get a very specific question, have you ever had more than one child, and the answer is no, I have trouble accepting that it's merely because of estrangement, that that was the reason the answer was given. Can you help me with that? And, Your Honor, I completely understand your perspective, and I certainly do not condone. Well, you don't know whether that's part of the culture or not, do you? I don't know specifically. I can only go by what the propositions have said, Armenian culture reflects. And this Court has not. What did they say? They said that in Armenian culture the child is supposed to obey the parents' wishes, and that sons such as Baruchin are supposed to want to raise their own families, not, as occurred here, marry into an existing family, a woman who is approximately 20 years older than he and already had two children. So, again, I am not in any way. . . They have said that, Your Honor. Both Dr. Papazian and Mrs. Papazian testified. You're changing your story right now. Oh, I'm not, Your Honor. No, you are. You just don't figure out what's important sometimes. You know, I spent a lot of time on this, hours and hours, going through all of these one by one. I understand that, Your Honor. And, again, I don't in any way condone what Dr. Papazian did, but he believed within the context of Armenian culture that because they were estranged from Baruchin that he essentially didn't exist. Again, that's not something I would do when testifying under oath. It's not something I would ever counsel a client to do. But that happened. We believe it's not material. If there are no further questions, I'd be glad to sit down so government counsels can argue. Thank you, Your Honor. May it please the Court. My name is Andrew O'Malley. I represent the Attorney General of the United States. This Court has denied a petition for review because substantial evidence in the record supports the agency's conclusion the lead petitioner failed to provide a credible claim and failed to demonstrate that, more likely than not, he would be tortured if removed to Russia. And when viewed as a whole, the agency's adverse credibility… How can you say that he wouldn't be tortured by the Russians? You know, read the country reports. Look at history. What's happened to these people? Yes, Your Honor. In the past 110 years, millions were slaughtered. Yes, Your Honor. They didn't have a country of their own in Russia. They were Christians in a state that didn't give much support to religion. Now they do. But all you have to do is look at history. See, I grew up with a lot of Armenians, so I know what they went through. Yes, Your Honor. Did you? No, Your Honor. So you don't have much credibility with me when you talk that way. Well, Your Honor, what the DOJ counsel's experiences were are really immaterial. It's the immigration judge's decision here. Sure they are, but you have to look at the broader picture in this country. Yes, Your Honor. I think you do. It's the immigration judge's decision that matters here. You have to look at history. You ever heard of the Civil War? I'm sorry? You ever heard of the Civil War? Yes, Your Honor. Good, good for you. All right, go on. Your Honor, the immigration judge specifically stated in the record, with respect to the Convention Against Torture claim, that he analyzed the objective evidence in the record. And the decision with respect to the Convention Against Torture is based on both the adverse credibility decision and the objective evidence in the record. What do we make of the argument that the IJ found that Dr. Papazian was not credible, but that he's made no adverse credibility as to the testimony of his wife, and that we are, therefore, compelled to believe her testimony is true, and that that, therefore, supports the Catt claim? Could you respond to that argument? Your Honor, it is Dr. Papazian's burden here. He is the lead petitioner. She is the derivative on his asylum application. It is his burden. It is his burden to be credible, whether or not they acted in concert in developing their claim, and she testified consistently with that. Well, I understand that it's his burden. On the other hand, the argument, I'm elaborating a little bit, but the argument is we have uncontradicted believed testimony that supports his claim. Not exactly, Your Honor. This is a blanket adverse credibility decision. The immigration judge discerned that Dr. Papazian was not credible. That includes all of the evidence that he submitted, including the testimony of his wife. With respect to Petitioner's claim that this should have been included in the Catt determination, that claim was not exhausted. Petitioner did raise the concept of credibility with respect to the wife in the facts section of his appellate brief before the Board, but did not argue it with respect to the Catt determination, and did so only specifically with respect to persecution. And again, the Catt determination is premised on the credibility decision as well, which is supported by substantial evidence in the record. Let me ask you this. One class of inconsistencies regarded Papazian's visa application. And were those inconsistencies, would you say, consistent with a person who is fleeing persecution? No, Your Honor. No? The fact that the inconsistencies in the visa application go to objective evidence in the record. Okay. Well, look. The I.J. said he doubted that Papazian could have fabricated documents regarding the fake Simtex job one day after the January 10, 2003 attack. That was one. Okay? Now, was there any evidence that Papazian himself created the Simtex documents? No, Your Honor. No. But it's more than that document. And I'm just asking you some questions. And he did testify the only documents he gave to the travel agency's agent were birth certificates, passports, marriage certificates, diploma, and Yannick's death certificate. Your Honor, he also submitted the extract from the registration. I'm just asking you. That's what he said. That's right. Okay. And then the I.J. believed that a letter that was attached to Papazian's visa application from the Russia-Hawaii tours to the U.S. Embassy, that application was December 5, 2002, undermined his assertion that they had been assaulted on January the 10th, 2003, because it showed they planned to leave Russia at an earlier date, not as a result of the attack. That was one of the... And, Your Honor, it is the entirety of the objective evidence in Exhibit 20. Answer my question. Yes, Your Honor. It absolutely includes the extract from the registration booklet. And does the record show that the December 2002 letter, like the plans to travel to Hawaii in general, were merely a ruse to escape from Russia? Does the record show that? It does not show that, Your Honor. It does not show that. However... And did he testify he was not familiar with Russia-Hawaii tours and did not know the person who signed the letter? That was part of his testimony, Your Honor. That's right. And that he had not obtained the letter himself and had not seen the letter before. That was also in the... However, in October of 2002... And he testified that he did not apply for the visa until after he lost the apartment. That's correct, Your Honor. Okay. And that application was dated the 11th. That's correct, Your Honor. So... When testifying as to the extract of his property... Who was his lawyer at that time? At what time, Your Honor? When he appeared before the hearing officer. Before the hearing officer? I'm sorry, Your Honor, I don't remember her name, but it was a different lawyer than appeared before the immigration court. In October of 2002... What was the name of the lawyer when he appeared before the IJ? Before the IJ, Your Honor? Yeah. There were several, or two. I apologize. Tatiana Edwards was the first lawyer before the immigration judge. And I'd have to go back through the record and jot down the name. I apologize, Your Honor. That's all right. Going back to the October 2002 extract, he specifically testified that he obtained that document to give to the travel agency. He stated this on several occasions. He stated this on page 294 to 295 of the record, page 316 of the record. It was only after he was confirmed with the fact that it was inconsistent with his testimony that he formulated his intent to depart on January 10th of 2003 that he went back and said, well, maybe I obtained that document for something else. There must have been a reason. Then there was a break in the proceedings, several-month break, and he came back and said, again, I must have obtained that to obtain a benefit, and that's why I got it not to give to the travel agency. That directly contradicts his claim that he had formulated his intent to depart Russia on January 10th of 2003. Your Honor? Well, did the IJ emphasize that? Yes, Your Honor. Uh-huh. And, indeed, that inconsistency, the inconsistency with respect to when they formulated their intent to depart from Russia, and specifically the inconsistency with respect to the omission of either children. The IJ didn't believe that after the transfer of the property to the militia that Papasan was somehow later able to show he had ownership of the property. He didn't believe that. That's right, Your Honor. He explained that the ownership of the property at the time he obtained his visa was a document he'd obtained before the transfer, right? And then he explained that after getting to the United States, he learned the transfer to the Kazakh officer never took effect because the transfer document lacked the proper power of attorney. And after that, they sold the apartment. That was the explanation. Well, that was the explanation. I'm sorry, I'm out of time. May I? It's all right. Your Honor, that is the explanation that was provided. There are many inconsistencies with respect to I'll give you my watch so you have a little more time. Thank you, Your Honor. There are many inconsistencies with respect to that transfer of the property. Going back to the asylum officer's notes in which he said, you know, if I contact the agency, will you be shown as the one who owns this property? He says, yes. He says, no. He says, I have a summer house in Sochi, but I can't give you the address of that. He comes into the immigration court and says, well, I obtained this property in 1977 through a private purchase, and later says, well, actually that was given to me by my work, and then later says, oh, I actually discovered that I still own this property and I was able to sell that by forging my son's signature. The story gets different each time he appears before an asylum officer or an immigration court. Well, there's a lot to go through here. I'll try to convince my colleagues. Thank you, Your Honor. The odds aren't very good, but I'll try. Thank you, Your Honor. And we respectfully request that you sign the petition. Thank you. I know that the panel is generous in giving me time, so I would make my rebuttal very quick. I just would like to note in response to the government's exhaustion argument that we clearly raise the objective evidence of record argument regarding torture regarding the Torture Convention with the BIA, and this Court has long held that not every single permutation of an argument needs to be raised in order for the claim overall to be exhausted. And so I also note that – Well, why don't you take 30 seconds and review your torture argument. Certainly, Your Honor. I'd be glad to. Go ahead. Mrs. Papazian's uncontroverted, credible testimony indicates that the family, either jointly or individually, was exposed to 10 different incidents of persecution and indeed outright physical torture by the elements of the Russian Federation, including the Cossacks, the Oman paramilitary force, the police, sometimes referred to as the militia, and skinheads who are acting with the willful acquiescence of the Russian Federation. So we believe that the IJ and the BIA did not adequately consider her testimony and the objective evidence of record, illustrating that a reasonable fact finder would be compelled to find that it is more likely than not that the Papazians would be tortured if they were removed by the United States government to the Russian Federation. I mean, has she personally been tortured? She has been, Your Honor. She was, along with Dr. Papazian – What did they do to her? She was beaten in June 2002 by six skinheads in a parking garage in Sochi. She was also assaulted twice by skinheads, once on a bus in December of 2002 and another time while walking – Is that when they threw her off the bus? That's correct, Your Honor. And another time in March 2002 when she was shopping on International Women's Day, which is a holiday in Russia, and she was pushed to the ground by skinheads while walking on the street with shopping bags. Let me interrupt for a minute. Certainly, Your Honor. Your thread that you're on, given that you're in trouble with regard to the doctor on his credibility, but with regard to her, even though the immigration judge did find against the wife with regard to credibility, nonetheless there wasn't any evidence that showed that what she was saying with regard to the attacks on her was not true. So there is a finding. I think you argued earlier that the immigration law judge didn't rule with regard to her credibility. He did. He lumped her together with the doctor. So what you have to do if you're going to succeed, it seems to me, is you have to take her testimony that is uncontroverted in terms of the detail that she talked about in her attacks, couple that with the country general information, and that's what your thread is, isn't it? More or less, Your Honor. And again, we are not in any way condoning the misstatements and omissions that Dr. Papazian engaged in. But there was no finding that she in her testimony engaged in anything similar to that. So when you look at the thread running through the entire case, there is consistent testimony about most of these incidents. And as Your Honor noted, there is pervasive objective evidence of record showing that ethnic Armenians, as this Court recognized in a 2002 case, I'm sorry, a 2000 case, are systemically persecuted in Russia. So it is more likely now they would be tortured if returned to Russian Federation, and we believe the Court should reverse on that issue. If we were to conclude that there is, under some construction of the evidence, credible testimony by Mrs. Papazian as to the treatment that she experienced, do we have to remand to the agency for its determination as to whether that rises to the level of a cat claim? Our view, Your Honor, is that it's not necessary because the BIA should have a value of that testimony. However, if the Court deems it to be the most optimal solution to this conundrum, that I think that's... In other words, you'll take whatever you can get. I think that's fair to say, Your Honor, and I think that we would take our chances on remand. What about his torture? What evidence is there that he was tortured? That Dr. Papazian was tortured. Well, he was also beaten up by skinheads in June of 2002 in the parking garage. He was beaten by Kozaks while waiting to pick up his pension at a post office in Sochi in September of 2002. What did they say anything to him? They yelled various anti-Armenian epithets. What did they say? They basically said that he was a dirty Armenian, that he should leave Russia. It's the same kind of language that was used all throughout these various episodes. The ethnic Russians essentially believe that ethnic minorities like Armenians, like Georgians, like Chechens should leave Russia. It's essentially an ethnic purging type of philosophy that they are espousing, and that if given the opportunity to do so, are going to perpetuate. So it's a very unfortunate situation that the Papazians are going to have to return to if they were removed to the Russian Federation. Again, just briefly, if I may sum up, Your Honor, I wasn't in any way attempting to go against what you wanted to do in terms of the tenor of the arguments. It's that we felt very strongly about the torture convention claim, and I hope that I adequately addressed everything you wanted to know about adverse credibility. My apologies to the Court for not starting promptly with adverse credibility. You don't need to apologize. Thank you, Your Honor. All right. Thank you. Without any further questions, I'll be prepared to submit. All right. This matter is submitted.
judges: Piersol, Pregerson, Fletcher